2002 OK 51

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Fred M. SCHRAEDER, Respondent.**

No. 4597.

Supreme Court of Oklahoma.

June 18, 2002.

Loraine Dillinder Farabow, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for complainant.

William G. LaSorsa, Jones, Givens, Gotcher & Bogan, Tulsa, OK, for respondent.

OPALA, J.

¶ 1 In this disciplinary proceeding against a lawyer, the issues to be decided are: [1] Does the record[1] submitted for our examination provide sufficient evidence for a meaningful *de novo* consideration of the complaint and of its disposition? and [2] Is a license suspension for thirty (30) days an appropriate disciplinary sanction for respondent's breach of professional ethics? We answer both questions in the affirmative.

# I

## INTRODUCTION TO THE RECORD

¶ 2 On 26 January 2001 the Oklahoma Bar Association [Bar] commenced this disciplinary proceeding against Fred M. Schraeder [Schraeder or respondent], a licensed lawyer, by filing a formal complaint in accordance with the provisions of Rule 6 of the Rules Governing Disciplinary Proceedings [RGDP].[2] The complaint alleges in four counts multiple violations of the Oklahoma Rules of Professional Conduct [ORPC][3] and of the RGDP. The charges include two grievances advanced by separate clients and respondent's failure to respond to the Bar's investigative inquiries in both matters. The Bar has since *withdrawn its reliance* on ORPC Rules 1.1, 1.2, 1.3, 3.2 and 8.4(c) in **Count I** (the *McMinn* grievance); ORPC Rules 1.1, 1.3, 1.5, 1.16(b)(2), (d), 3.2 and 8.4(c) in **Count II** (the *Parsons* grievance); and on ORPC Rule 8.4(c) in **Counts II and IV** (for respondent's failure timely to respond to the Bar's inquiries). *The Bar now rests the four counts solely on:* (1) ORPC Rules 1.4, 1.5, 1.15(b), 1.16(b)2, (d), 3.2, 8.4(a) and RGDP Rule 1.3 in **Count I**; (2) ORPC Rules 1.4, 1.15(b), 8.4(a) and RGDP Rule 1.3 in **Count III; and** (3) ORPC Rules 8.1(b), 8.4(a) and RGDP Rules 1.3 and 5.2 in **Counts II and IV.**

¶ 3 At the commencement of its hearing on 16 May 2001 a trial panel of the Professional Responsibility Tribunal [panel or PRT] recognized for the record the admission of the parties' stipulations of fact, conclusions of law and an agreed disciplinary recommendation. As for mitigation, the parties agreed that respondent had never before been disciplined (by the Professional Responsibility Commission or by this court) or been the subject of a formal investigation by the Bar's counsel. The parties submit *professional burnout syndrome*[4] as a factor to be considered in mitigation of respondent's culpability.

¶ 4 Upon completion of the hearing and consideration of the stipulations and testimony on file, the trial panel issued its report (which incorporates the parties' stipulations). The panel recommended that respondent receive a private reprimand and be directed to pay the costs of this proceeding.

# II

## THE RECORD BEFORE THE COURT PROVIDES SUFFICIENT EVIDENCE FOR A MEANINGFUL *DE NOVO* CONSIDERATION OF ALL FACTS RELEVANT TO THIS PROCEEDING

¶ 5 In a bar disciplinary proceeding the court functions as an adjudicative licensing authority that exercises exclusive original cognizance.[5] The court's jurisdiction rests

---

1. The record consists of a transcript of the PRT hearing, the PRT's report, the parties' stipulations of fact, conclusions of law, factors to be considered in mitigation of charges, sixty-three (63) exhibits offered by the parties (including joint exhibits on professional burnout syndrome) and a joint brief of the parties in support of the report and recommendation of the PRT.

2. The provisions of RGDP Rule 6.1, 5 O.S.2001, Ch. 1, App. 1–A, state in pertinent part:

   "The proceeding shall be initiated by a formal complaint prepared by the General Counsel, approved by the Commission, signed by the chairman or vice-chairman of the Commission, and filed with the Chief Justice of the Supreme Court."

3. 5 O.S.2001, Ch. 1, App. 3–A.

4. For a discussion of professional burnout syndrome, see *infra* note 40.

5. *State ex rel. Okla. Bar Ass'n v. Leigh,* 1996 OK 37, ¶ 10, 914 P.2d 661, 666; *State ex rel. Okla. Bar Ass'n v. Eakin,* 1995 OK 106, ¶ 8, 914 P.2d

on the court's constitutionally vested, nondelegable power to regulate the practice of law, including the licensure, ethics, and discipline of this State's legal practitioners.[6] In deciding whether discipline is warranted and what sanction, if any, is to be imposed for the misconduct charged, the court conducts a full-scale, nondeferential, *de novo* examination of all relevant facts,[7] in which the findings, conclusions and recommendations of the trial panel are neither binding nor persuasive.[8] In its task, the court is not guided by the scope-of-review rules that govern corrective relief on appeal or in certiorari proceedings in which another tribunal's findings of fact may have to be left undisturbed by adherence to some law-imposed standards of deference.[9]

■■■ ¶ 6 The court's duty can be discharged only if the trial panel submits a complete record of the proceedings.[10] Our initial task is to ascertain whether the tendered record is sufficient to permit (a) an independent on-the-record determination of the critical facts and (b) the crafting of an appropriate discipline.[11] The latter is that

which (1) is consistent with the discipline imposed upon other lawyers who have committed similar acts of professional misconduct and (2) avoids the vice of visiting disparate treatment of an offending lawyer.[12]

¶ 7 Having carefully scrutinized the record submitted, we conclude that it is adequate for *de novo* consideration of the respondent's alleged professional misconduct and of the discipline to be imposed.

# III

## FACTS ADMITTED BY STIPULATION

■■■ ¶ 8 The parties have tendered their stipulations by which respondent admits the facts which serve as the basis of the charges against him. A stipulation of fact is an agreement by the parties that a particular fact (or facts) in controversy stands admitted. It serves as an evidentiary substitute that dispenses with a need for proof of facts that are conceded by the parties' agreement. Stipulations are subject to the approval of the court in which they are entered.[13] Re-

644, 647–48; *State ex rel. Okla. Bar Ass'n v. Bolton*, 1994 OK 53, ¶ 15, 880 P.2d 339, 344; *State ex rel. Okla. Bar Ass'n v. Donnelly*, 1992 OK 164, ¶ 11, 848 P.2d 543, 545; *State ex rel. Okla. Bar Ass'n v. Raskin*, 1982 OK 39, ¶ 11, 642 P.2d 262, 265–66.

6. *Eakin, supra* note 5, at ¶ 8, at 648; *State ex rel. Okla. Bar Ass'n v. Downing*, 1990 OK 102, ¶ 12, 804 P.2d 1120, 1122–23; *Raskin, supra* note 5, at ¶ 11, at 265–66.

7. *Leigh, supra* note 5, at 666–67; *Eakin, supra* note 5, at ¶ 8, at 647–48; *State ex rel. Okla. Bar Ass'n v. Lloyd*, 1990 OK 14, ¶ 8, 787 P.2d 855, 858; *State ex rel. Okla. Bar Ass'n v. Stubblefield*, 1988 OK 141, ¶ 7, 766 P.2d 979, 982; *State ex rel. Okla. Bar Ass'n v. Brandon*, 1969 OK 28, ¶ 5, 450 P.2d 824, 827. Because this court's cognizance of disciplinary proceedings cannot be shared with any other institution, every aspect of the Bar's adjudicative process must be revisited by our *de novo* consideration. The attribute of nondelegable jurisdiction serves to distinguish the conduct of bar disciplinary functions from trial *de novo*—a retrial in a different court—or even from *de novo* appellate review on the record, which stands for an independent, non-deferential examination of another tribunal's record.

8. *Eakin, supra* note 5, at ¶ 8, at 648; *Raskin, supra* note 5, at ¶ 11, at 265.

9. The court's range of options in a disciplinary proceeding is set forth in RGDP Rule 6.15(a), 5 O.S.1991, Ch. 1, App 1–A, which states: "The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate." *Eakin, supra* note 5 at ¶ 8, at 648; *State ex rel. Okla. Bar Ass'n v. Farrant*, 1994 OK 13, ¶ 7, 867 P.2d 1279, 1284; *Bolton, supra* note 5, at ¶ 15, at 344; *Levi v. Mississippi State Bar*, 436 So.2d 781, 782 (Miss.1983).

10. *Eakin, supra* note 5, at ¶ 9, at 648. A deficient record can never afford grounds for this court's abdication of its constitutional responsibility to conduct a meaningful *de novo* review. This court has declined to exercise jurisdiction by returning a case for a full-scale evidentiary hearing before the trial panel, *see Lloyd, supra* note 7, at 858 (for a complete explanation of the applicable procedure).

11. *Eakin, supra* note 5, at ¶ 9, at 648, *Bolton, supra* note 5, at ¶ 16 at 345.

12. *Eakin, supra* note 5, at ¶ 9, at 648; *Bolton, supra* note 5, at ¶ 16, at 345; *State ex rel. Okla. Bar Ass'n v. Perceful*, 1990 OK 72, ¶ 5, 796 P.2d 627, 630.

13. *State ex rel. Okla. Bar Ass'n v. Livshee*, 1994 OK 12, ¶ 7, 870 P.2d 770, 774.

spondent's stipulations of facts (a) have been made voluntarily and with knowledge of their meaning and legal effect and (b) are not inconsistent with any facts otherwise established by the record. We hence approve and adopt the parties' tendered stipulations.

## A

### Count I—*The McMinn Grievance*

¶ 9 Count one is predicated upon a grievance by Perry A. McMinn [McMinn]. McMinn hired respondent to assist in a criminal appeal filed in the United States District Court for the Northern District of Oklahoma.[14] He paid respondent on 4 September 1997 the sum of $2,000 by cashier's check as part of the agreed fee of $10,000 and gave Schraeder an additional $800 on 21 January 1998.

¶ 10 After writing McMinn in February, March and May of 1998, respondent ceased communicating with his client and failed to file any motions or briefs in his appeal. Following respondent's inactivity, McMinn filed a motion on his own behalf and wrote respondent a letter, dated 5 May 1999, asking him to review and revise the document. When respondent failed to reply, McMinn wrote him again on 2 June 1999 and enclosed copies of several cases that he wanted him to re-

view. Respondent did not answer the June 2 letter; he claims that he never received the letter or the enclosed cases. By letter dated 27 September 1999 McMinn requested a detailed accounting of all costs and legal services expended on his behalf and a refund of the unearned portion of the $2,800 fee. *Respondent failed to answer the September 27 letter.*

¶ 11 Schraeder *insists* (1) that he filed no briefs or pleadings in the McMinn case because he was waiting to receive pertinent information from McMinn's family to proceed with the appeal [15] and *claims* (2) that he neither responded to the September 27 letter nor provided the requested accounting because he believed that he had earned the $2,800 fee by (a) *researching* the various issues in the McMinn appeal, (b) *speaking* on several occasions to members of McMinn's family and (c) *traveling* twice to visit McMinn at the Adult Detention Center in Tulsa, Oklahoma.

¶ 12 The Bar and respondent agree that the latter's misconduct violates the mandatory provisions of ORPC Rules 1.4 [16] (failure promptly to communicate with his client's request for information),1.5 [17] (failure to charge reasonable fees), 1.15(b) [18] (failure promptly to account for and return any unearned fees), 1.16(b)(2) and (d) [19] (failure

---

14. *United States of America v. Perry A. McMinn,* 97–CR–26 (United States District Court for the Northern District of Oklahoma).

15. Schraeder's main reason for not proceeding with the appeal is that he was waiting on information from McMinn's family about his genealogy (whether they had proof of his Native American heritage) to either materially assist a motion to dismiss the case from federal court for lack of jurisdiction over a criminal matter that allegedly occurred on Indian land or ask for re-sentencing to a term that would require McMinn's immediate release.

16. The critical terms of ORPC Rule 1.4, 5 O.S. 2001, Ch. 1, App. 3–A provide:

    (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
    (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

17. The pertinent terms of ORPC Rule 1.5(a), 5 O.S.2001, Ch. 1, App. 3–A provide:

    (a) A lawyer's fee shall be reasonable. * * *

18. The pertinent terms of ORPC Rule 1.15(b), 5 O.S.2001, Ch.1, App. 3–A provide:

    (b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, *a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive* and, *upon request by the client or third person, shall promptly render a full accounting regarding such property.*
    (emphasis added).

19. The terms of ORPC Rule 1.16(b)(2) and (d), 5 O.S.2001, Ch. 1, App. 3–A provide in part:

    (b) Except as stated in paragraph (c), a lawyer may withdraw from representing a client if withdrawal can be accomplished without ma-

promptly to notify McMinn of his withdrawal from the appeal), 8.4(a)[20] (misconduct) and RGDP Rule 1.3[21] (bringing discredit upon the legal profession). Upon *de novo* review of the record, we hold the charges are supported by clear and convincing proof that respondent's conduct warrants the imposition of discipline.

## B

### Count III—*The Parsons Grievance*

¶ 13 In Count three of the complaint the Bar charged respondent with failure to communicate with a client and to perform the work for which he was hired. Around *13 February 1999* Loretta Parsons [Parsons] retained Schraeder to represent her grandchildren's interest in her deceased daughter's estate. He was also to represent another granddaughter in both a criminal and a domestic matter. Parsons paid him $1,500.00. She also delivered to him several documents relevant to the estate as well as to possible civil litigation pertaining to her daughter's death. Respondent claims that Parsons paid him the fee to represent two of Parsons' adult children in three legal matters but that he never agreed to represent her in any wrongful death or other civil action. He insists that he completed the criminal and

domestic matters for one granddaughter and performed work in the probate case.

¶ 14 The record is replete with letters from Parsons to respondent in which she insists that her efforts to communicate with respondent and to retrieve from him personal documents relating to a wrongful death suit proved unsuccessful. Schraeder takes the position that he terminated all communications with Parsons because his representation ended after the conclusion of the estate matters for her grandchildren and another family member's criminal case and annulment.

¶ 15 A constant flow of communication between an attorney and client constitutes a vital part of a lawyer's professional undertaking.[22] When a client seeks information from one who is retained for representation, prompt responsive action should be forthcoming. *Prolonged and willful silence by the lawyer's failure to return calls or answer letters is the very kind of neglect that destroys the public's confidence in the lawyer's integrity.*[23]

¶ 16 Both the Bar and respondent agree that the latter's actions *violate* the

---

terial adverse effect on the interests of the client, or if:

\* \* \*

(2) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;

\* \* \*

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

20. The terms of ORPC Rule 8.4, 5 O.S.2001, Ch. 1, App. 3–A provide in pertinent part:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; \* \* \*

21. The pertinent terms of RGDP Rule 1.3, 5 O.S.2001, Ch. 1, App. 1–A provide:

The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action. . . .

22. "Professional competence—*i.e.*, acting promptly in pending matters and communicating with a client—is a *mandatory obligation* imposed upon licensed practitioners. Albeit onerous, this obligation is the *very minimum* to be expected from a lawyer. It epitomizes professionalism. Anything less is a breach of a lawyer's duty to serve the client." *State ex rel. Oklahoma Bar Ass'n v. Evans*, 1994 OK 45, ¶ 16, 880 P.2d 333, 338–39 (citing *Raskin, supra* note 5 at 267) (emphasis in the original).

23. *Id.*

mandatory provisions of ORPC Rules 1.4,[24] 1.15(b),[25] and 8.4(a)[26] and RGDP Rule 1.3[27] and *constitute* grounds for the imposition of professional discipline. On *de novo* review of the record, we hold there is clear and convincing probative support in the record for a breach of professional ethics and that the imposition of discipline is warranted.

## C

### COUNTS II AND IV—*Failure Timely to Respond to the Bar's Investigative Inquiries into the McMinn and Parsons Grievances*

¶ 17 Counts II and IV address respondent's delay in filing his response to the Bar's investigative inquiries in the McMinn and Parsons grievances. Respondent failed timely to respond to the Bar's three written requests and promptly to take action with respect to statements he made on two occasions to the Bar's investigator.

### *The McMinn Grievance*

¶ 18 The Bar notified respondent by letter dated *16 February 2000* that the McMinn grievance was being opened for formal investigation, invoking the requirement that Schraeder provide a complete response within a twenty-day (20) period.[28] On *March 14* the Bar notified Schraeder by certified mail containing a warning that failure to respond would result in the issuance of a *subpoena duces tecum* and require his testimony at the Bar Center. Respondent offered an explanation in a belated letter to the Bar (dated *March 13* and postmarked *March 16*). He claimed that McMinn failed to provide critical information in a timely fashion and that any delay was caused by the lack of information he needed to proceed with the McMinn appeal.

¶ 19 The Bar's assigned investigator, Ray Page [Page or investigator] met with Schraeder concerning the McMinn and Parsons grievances. Schraeder assured Page that he would attempt to resolve with McMinn the dispute over the unearned portion of fees. Respondent's undated letter to the Bar, received *22 November 2000,* shows that he wrote McMinn asking what portion of the fee he desired to have returned to him. McMinn's *November 28* letter to respondent requested a refund of the entire $2,800.

¶ 20 By a *16 December 2000* facsimile transmission, respondent advised Page of his letter to McMinn and of McMinn's November 28 response. Contrary to respondent's statement that he would send Page a copy of his response to McMinn's November 28 request, the Bar received a *December 26* letter from McMinn advising that *he had not received a response* to his November 28 letter. Respondent concedes that he did not promptly respond to McMinn's November 28 refund request, but claims that the delay was caused by the closing of his private practice and the moving of his law office. Respondent eventually provided McMinn with a full accounting of legal services and has refunded approximately $1,195.00 of the $2,800 fee. The respondent's conduct violates the mandatory provisions of ORPC Rules 8.1(b)[29] and

---

**24.** For the pertinent terms of ORPC Rule 1.4, see *supra* note 16.

**25.** For the pertinent terms of ORPC Rule 1.15(b) see *supra* note 18.

**26.** For the pertinent terms of ORPC Rule 8.4(a), see *supra* note 20.

**27.** For the terms of RGDP Rule 1.3, see *supra* note 21.

**28.** *See* the terms of RGDP Rule 5.2, *infra* note 32.

**29.** The terms of ORPC Rule 8.1(b) provide in pertinent part:

> An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
>
> * * *
>
> (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority. . . .

8.4(a)[30] and RGDP Rules 1.3[31] and 5.2[32] and warrants the imposition of discipline.

### The Parsons Grievance

¶ 21 By letter of *10 May 2000* the Bar advised respondent of Parsons' complaint and directed him to communicate with her within two weeks. Respondent wrote to Parsons and was informed by her letter of *May 23* which items she wanted him to return. Because respondent neither returned the requested documents nor responded to her letter, the Bar demanded (by letter of *June 5*) that respondent return the items to her by *June 13* or at least offer an explanation as to why it would have been impossible for him to do so. Respondent was advised by the Bar's letter that failure timely to respond would be grounds for discipline and result in a formal investigation.

¶ 22 One *14 June 2000* the Bar received a letter from Parsons stating that respondent had neither communicated with her nor returned the requested items. Two days later the Bar received a letter from respondent, dated *June 12* and post-marked *June 15,* which advised that he had previously forwarded all documents to Parsons and that he could find no additional items in his office.

¶ 23 The Bar notified Schraeder by letter of *10 July 2000* that it was opening the Parsons matter for formal investigation, again invoking the requirement of a written response within twenty days. On *August 1* Parsons notified Page, the Bar's investigator, that she had entrusted certain documents to respondent when she retained him to file a wrongful death action. She explained that the documents were needed so that a lawsuit could be filed by another lawyer before it became time barred. Page's *August 11* letter to respondent requested that he again search for the items, stressing that a response was needed within 10 days to prevent the statute of limitations from running out. *No reply was forthcoming from Schraeder.*

¶ 24 After being advised by Parsons on *August 22* that respondent had not contacted her about the missing documents, Page called respondent, leaving a message on his machine to return his call. *Schraeder failed to respond.*

¶ 25 Page finally met with respondent at his Drumright office on *7 November 2000.* Respondent assured him that he would contact his former secretary to see if she could help him locate Parsons' missing documents. The following day respondent telephoned Parsons, advising her of his plan to enlist the aid of his former secretary. On *December 14* respondent advised Page that he had located the missing documents and would mail them to Parsons the next day, as well as send the Bar a copy of the returned mail receipt. Respondent confirmed these plans by *December 16* facsimile transmission to Page. The record indicates *respondent did not return the remainder of Parsons' files until on or about 21 March 2001.* Respondent insists that the delay was due to activity in closing his private practice.

¶ 26 The terms of RGDP Rule 5.2 provide that the failure of a lawyer to answer the Bar's request for information *shall be* grounds for discipline.[33] A lawyer's obligation to respond to a Bar complaint is mandatory and leaves no room for interpretation about the proper form or time for filing a response.[34] Respondent admits that he violated the mandatory provisions of ORPC

---

**30.** For the critical terms of ORPC Rule 8.4(a), see *supra* note 20.

**31.** For the pertinent terms of RGDP 1.3, see *supra* note 21.

**32.** The terms of RGDP Rule 5.2 (*Investigations*), 5 O.S.1981, Ch. 1, App. 1–A provide in pertinent part:

> After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall ... (2) file and serve a copy of the grievance ... upon the lawyer who shall thereafter make a written response which contains a full and fair disclosure of all facts and circumstances pertaining to the respondent lawyer's alleged misconduct.... The failure of the lawyer to answer within twenty (20) days after service of the grievance ... *shall be grounds for discipline. ...*
> (emphasis added).

**33.** *Id.*

**34.** *Id.*

Rules 8.1(b),[35] 8.4(a) [36] and RGDP Rules 1.3,[37] 5.2 [38] and that his misconduct constitutes grounds for the imposition of professional discipline. We agree. The only question remaining here is the proper disciplinary measure to be imposed for respondent's breach of professional ethics.

## IV

## FACTORS TO BE CONSIDERED IN MITIGATION OF DISCIPLINE

¶ 27 Mitigating circumstances may be considered in the process of assessing the appro-

35. The relevant portion of ORPC Rule 8.1(b), 5 O.S.1991, Ch.1, App. 1–A provides in part:
An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not ... (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.

36. For the terms of ORPC Rule 8.4(a), see *supra* note 20.

37. See *supra* note 21 for the terms of ORPC Rule 1.3.

38. For the pertinent terms of RGDP Rule 5.2, see *supra* note 32.

39. *See State ex rel. Okla. Bar Ass'n v. Colston,* 1989 OK 74, 777 P.2d 920; *see also Raskin, supra* note 5 at 267.

40. *Professional burnout syndrome* has been used in bar disciplinary matters either as a defense or as a mitigating factor. *See State ex rel. Okla. Bar Ass'n v. Wolfe,* 1996 OK 75, 919 P.2d 427 (lawyer's license to practice law was suspended for two years and one day despite the use of *burnout* as a defense); *In re Conduct of Loew,* 292 Or. 806, 642 P.2d 1171 (1982) (a lawyer's license was suspended for thirty days despite the court's recognition of burnout as mitigating factor for neglect of a legal matter and for misrepresentation to a client); *In re Ontell,* 593 A.2d 1038, 1042 (D.C.1991) (a lawyer's license was suspended for thirty days for two instances of neglect of legal matters coupled with misrepresentation to clients despite the court's recognition of *burnout* as a mitigating factor). In *Loew, supra,* at 1173, the respondent's psychiatrist described the condition as follows:
"A number of things occur when somebody has reached this so[-]call[ed] burn out point. They feel fatigue all the time, they have difficulty sleeping, they feel drained, may have an array of physical ailments which occur which are quite real, maybe hospitalized as you were, have memory lapses, impaired concentration, frequently miss deadlines, backlog of work, financial problems, begin to view patients or clients or whatever people you're working with, or you begin to view your work as the enemy and 'Oh, my God, here comes another patient, another client,' and so on. Rather than someone who is a team member, it's an opponent."
In Judith L. Maute, *Balanced Lives in a Stressful Profession: an Impossible Dream?,* 21 Cap. U.L.Rev. 797, 812 n. 54 (1992), the author observes that in many discipline cases evidence of burnout results in neglect, citing in footnote 54:
*In re Sullivan,* 530 A.2d 1115 (Del.1987) (lawyer disbarred for pattern of serious misconduct; court rejected claim of mental incompetence); *Colorado v. Heilbrunn,* 814 P.2d 819 (Colo.1991) (repeated instances of neglect related to lawyer's severe chronic depression which led to drug and alcohol abuse). A number of articles have been written on the subject. *See, e.g.,* Michael J. Sweeney, *Stress, Anxiety & Burnout,* Practical Skills Seminar (1989); Thomas L. Cory, *Stress: How it Affects Trial Lawyers and Their Clients,* 24 TRIAL 54–57 (May 1988); Sarah B. Singer, *Stress and the Sole Practitioner Hard Times for Lawyers,* Boston B. J., Nov–Dec.1987 at 16; Stress Takes Heavy Toll on Profession ... [B. Leader–Sept. Oct.1990, at 19]; Marion R. Frank, *How to Avoid Burnout,* Penn. L.J. Rep., March 7, 1988, at § 2.
In Charles J. Ogletree, Jr. *Beyond Justifications: Seeking Motivations to Sustain Public Defenders,* 106 Harv. L.Rev. 1239, 1241 n. 9 (1993), the author states:
Burnout has been studied empirically in various contexts. *See, e.g.,* Deborah L. Arron, Running from the Law: Why Good Lawyers Are Getting Out of the Legal Profession 2–3 (1989); Barry A. Farber, Crisis in Education. Stress and Burnout in the American Teacher 24 (1991) ("Burnout is a work related syndrome that stems from an individual's perceptions of a significant discrepancy between effort (input) and reward (output).... It occurs most often in those who work face to face with troubled or needy *clients* ...." *(emphasis omitted));* Paul Ligda, *Work Overload and Defender Burnout,* 35 NLADA Briefcase 5, 5 (1977) (noting the effects of working environment on public defender performance)....

priate quantum of discipline.[39] Respondent has raised several factors in mitigation.

¶ 28 Respondent submits medical proof that he suffered from *occupational burnout*[40] diagnosed by his physician during the time of the breach. When the condition is tendered as a mitigating factor for assessment of one's culpability there must be a causal relationship between a medical condition and the professional misconduct

charged.[41] *Yet emotional or psychological disability, though it may serve to reduce the actor's ethical culpability, does not immunize one from imposition of disciplinary measures that are necessary to protect the public.*[42] The record provides a sufficient causal connection between respondent's ethical lapses and his professional burnout syndrome. His condition is now believed by his physician to have been arrested. Respondent continues to be seen once a week as part of an ongoing counseling program.

¶ 29 Shortly after he became aware of his inability fully to serve his clients respondent sought to correct certain deficiencies in the way his office was managed by closing out his private practice and joining an assemblage of practitioners who can assist him.

¶ 30 Respondent has been a member of the bar for over 19 years and his professional record reflects neither previous blemishes nor a pattern of misconduct.[43] He has acknowledged and accepted responsibility for his professional derelictions. The record shows that respondent's actions caused no grave economic harm. We note that respondent's dealings with the Bar, *albeit* dilatory during the initial investigative stages, were characterized by candor and cooperation during the latter stages and in the PRT proceedings.

¶ 31 We have taken these matters into account in fashioning the appropriate measure of discipline.

## V

## RESPONDENT'S MISCONDUCT WARRANTS A LICENSE SUSPENSION FOR THIRTY (30) DAYS TOGETHER WITH PAYMENT OF THE COSTS OF THIS PROCEEDING

¶ 32 A bar disciplinary process, including that for imposition of a disciplinary sanction, is designed not to punish the delinquent lawyer, but to safeguard the interests of the public, of the judiciary, and of the legal profession.[44] Neglect of a lawyer's responsibilities compromises the independence of the profession and the public interest which that independence serves.[45] A license to practice law is not conferred for the benefit of an individual, but for that of the public.[46] The disciplinary measure imposed upon an offending lawyer should be consistent with the discipline imposed upon other practitioners for similar acts of professional misconduct.[47]

¶ 33 A lawyer's failure to respond to the bar's investigative inquiries is a serious offense. This court in *State ex rel. Oklahoma Bar Association v. Robb*[48] imposed a suspension of two years and one day for a lawyer's *failure to respond* to three client grievances or *appear* for depositions in response to subpoenas and for *failure to respond* to the disciplinary complaint.

¶ 34 The trial panel recommends a private reprimand as a fit discipline for respondent's breach of professional ethics. After a review of the record and the court's acceptance of the tendered mitigating factors, we hold that the appropriate disciplinary measure to be imposed is a thirty-day suspension of license to practice law. Today's decision is based upon the cumulative

41. "When alcoholism is tendered as a mitigating factor there must be some causal relationship between one's alcoholic affliction and the professional misconduct charged." *State ex rel. Okla. Bar Ass'n v. Giger*, 2001 OK 96, ¶ 15, 37 P.3d 856, 863 n. 31 (quoting *Donnelly, supra* note 5, at ¶ 17, n. 21, at 548 n. 21).

42. *Coppock v. State Bar*, 44 Cal.3d 665, 244 Cal. Rptr. 462, 749 P.2d 1317 (1988) (citing *Palomo v. State Bar*, 36 Cal.3d 785, 205 Cal.Rptr. 834, 685 P.2d 1185 (1984)).

43. A lawyer's good character, reputation and exemplary professional standing are factors to be considered in mitigation of charges. *State ex rel.*

*Okla. Bar Ass'n v. Steger*, 1966 OK 188, 433 P.2d 225, 227.

44. *State ex rel. Okla. Bar Ass'n v. Smith*, 1980 OK 126, ¶ 21, 615 P.2d 1014, 1018.

45. *See* Preamble to the Oklahoma Rules of Professional Conduct, 5 O.S.2001, Ch. 1, App. 3–A.

46. *Smith, supra* note 44, at ¶ 21, at 1018; *State ex rel. Okla. Bar Ass'n v. Lowe*, 1982 OK 20, ¶ 19, 640 P.2d 1361, 1363.

47. *Eakin, supra* note 5, at ¶ 9, at 648; *Bolton, supra* note 5, at ¶ 16, at 345.

48. 1997 OK 84, 942 P.2d 196.

effect of the following factors: (1) respondent's utter failure *promptly* to respond to the bar's investigative inquires, (2) his lack of concern for a client's economic interest by *refusal promptly* to account for and restore the unearned portion of fees for nearly a three-year period and (3) his *disregard* for a client's right to know the status of her case. Although we take note that upon his own initiative respondent sought to determine if there was an underlying cause for his apathy and lost sense of career satisfaction and now seeks professional counseling on a continual basis, the standards to be followed are those that best protect the public and not those that shield the offending lawyer.

## VI

## SUMMARY

¶ 35 In sum, the record bears clear and convincing proof that respondent's participation in several episodes of unprofessional conduct violates the rules governing professional ethics. After a thorough review of the record and recognition of the tendered mitigating factors,

RESPONDENT'S LICENSE TO PRACTICE LAW STANDS ORDERED SUSPENDED FOR THIRTY (30) DAYS AND HE IS DIRECTED TO PAY THE COSTS OF THE INVESTIGATION, RECORD AND PROCEEDING IN THE AMOUNT OF $571.03, WHICH SHALL BECOME DUE NOT LATER THAN THIRTY (30) DAYS AFTER THIS OPINION BECOMES FINAL.

¶ 36 HARGRAVE, C.J., KAUGER, SUMMERS, BOUDREAU and WINCHESTER, JJ., concur.

¶ 37 WATT, V.C.J., HODGES and LAVENDER, JJ., concur in part and dissent in part.

LAVENDER, J., with whom WATT, V.C.J., and HODGES, J., join, concurring in part and dissenting in part.

¶ 1 I would administer a public reprimand.